LISKO *v.* HICKS.

4-4933

Opinion delivered February 28, 1938.

*J. F. Holtzendorff* and *Joseph Morrison,* for appellant.

*A. G. Meehan* and *John W. Moncrief,* for appellee.

GRIFFIN SMITH, C. J. The chancery court for Arkansas county upheld the contention of Frank Hicks that he had entered into a certain oral contract with John Lisko, Sr. Lisko died a month later and his widow and heirs, denying that the alleged contract had been made, undertook to avoid its consequences.

The various proceedings leading up to this controversy are somewhat involved, but a review is necessary to an understanding of this appeal.

In 1926, E. W. Crandall loaned $400 to Earle W. Moorehead. To secure his note, Moorehead mortgaged all of Block "P" of Crescent Hill Addition to the city

of Stuttgart. In 1928, Moorehead sold the property to Roy Hicks. As part of the purchase price Hicks assumed payment of the balance outstanding under Moorehead's mortgage to Crandall. Moorehead executed and delivered his warranty deed to Hicks, and Hicks, in turn, mortgaged the property to Moorehead, each transaction having been subject to the prior obligation. Notes given by Hicks to Moorehead were by Moorehead indorsed to Emma Thompson.

On March 4, 1933, Crandall, alleging nonpayment of the Moorehead note, filed suit to foreclose the mortgage. Moorehead answered, admitting the obligation, but alleged assumption by Roy Hicks. Moorehead also admitted the claim of Emma Thompson. The latter, by way of answer and cross-complaint, asked for the relief to which she was entitled.

Answer and cross-complaint were filed by John Lisko, Sr. He alleged that Frank Hicks, a brother of Roy Hicks, as an incident to a loan, caused Roy Hicks to execute a deed conveying the west half of Block "P," the intent being that the deed should be held by Lisko as partial security for the loan, and treated as a mortgage. In further explanation of the transaction it was alleged that other security was a chattel mortgage on a rice crop then being grown.

Proceeds from the sale of rice having proved insufficient to meet the indebtedness against it, Frank Hicks and Lisko entered into a written contract dated January 6, 1933, such contract being in substitution of a contract of April 28, 1932.

In the 1933 contract, Hicks agreed to execute six notes for $289.81 each ($1,738.86) in evidence of an admitted balance of $1,473.59. These notes were to mature annually and bear interest from date at the rate of six per cent. If paid before maturity they were subject to a discount on a six per cent. basis from date of issue to date of maturity, but if not paid at maturity interest would be 10 per cent. per annum.

Prior to execution of this contract Roy Hicks had delivered to Lisko a deed to the west half of "Block 1,"

Crescent Hill Addition to Stuttgart. It was later agreed that the description was erroneous, the intent being to convey the west half of "Block P," etc. As a further condition, each party bound himself to execute quit-claim deeds to the property in question for deposit with the First State Bank as escrow agent. Frank Hicks was to supply Lisko with an abstract and to insure build-ings on the lots for $1,500.

A decree was rendered December 19, 1933, with judg-ments in favor of Crandall for $480.37, and in favor of Mrs. Thompson for $199.44. The decree contained the following:

"Any proceeds resulting from the sale hereunder over and above the amount necessary to pay the costs herein accrued, the amount decreed to be due plaintiff E. W. Crandall, and cross-complainant Emma Thomp-son, shall be by the commissioner of this court held in his hands subject to the final decree hereinafter to be rendered between John Lisko, cross-complainant, against Roy Hicks and Alma Hicks, his wife, and Frank Hicks and Rose Hicks, his wife. Provided, that in the event that John Lisko shall at the time of said sale purchase said property for an amount greater than the sums here-in decreed to be due the said E. W. Crandall and Emma Thompson, together with costs, equal to or less the amount claimed to be due the said John Lisko after he shall have paid into the hands of the commissioner of this court the sums herein decreed to be due the said E. W. Crandall and Emma Thompson, and the costs, shall be and is hereby permitted to execute an additional bond to the commissioner of this court for the amount of such surplus bid, said bond to stand in lieu of the money until the final adjudication and decree on said cross-complaint of John Lisko against the said Roy Hicks and Frank Hicks [and their wives], not to exceed six months from the date of such sale."

At the sale on February 16, 1934, Lisko purchased the property for the aggregate of the two judgments, $679.81, together with interest and cost. No exceptions were filed to the commissioner's report, and it was con-

firmed March 5, 1934. The deed, embracing ''all of Block 'P' of Crescent Hill Addition'' was acknowledged and approved in open court.

On March 31, 1934, a writ of possession issued from the chancery court, commanding the sheriff to take the property in question from the possession of Frank Hicks and deliver possession to Lisko. Thereafter (April 3, 1934) Frank and Roy Hicks filed their petition requesting that the writ of possession be recalled, and this was done. They alleged that they were the true owners of the property; that they were indebted to Lisko; that the deed executed by Roy Hicks and delivered by Frank Hicks to Lisko was in fact a mortgage; that it did not describe the property involved; that prior to foreclosure an agreement was entered into between Frank and Roy Hicks and Lisko under the terms of which Lisko was to buy the property at the foreclosure sale. There was this allegation: ''It was agreed that Frank and Roy Hicks would pay certain old indebtedness due John Lisko and would repay to John Lisko the purchase price of said property at the commissioner's sale, plus interest, and John Lisko was to hold his purchase at the commissioner's sale and the commissioner's deed as security for the indebtedness covered by the agreement. . . . It was agreed between these parties that John Lisko would give Frank and Roy Hicks time in which to pay the old indebtedness and to repay the amount expended by John Lisko at the commissioner's sale. . . . Relying upon said agreement [Frank and Roy Hicks] did forego other remedies and made no other arrangements for the protection of their rights.''

In an amendment to the petition it was alleged that Frank Hicks had acquired Roy's interest in the real property, and that in fact the agreement of John Lisko was with Frank Hicks; that the agreement, in addition to the things set out in the original petition, called for repayment by Frank Hicks of money expended by John Lisko for attorney's fee and an abstract; that the agreement between the three parties was that Frank Hicks was to pay Roy Hicks a certain sum of money for Roy's

equity in the property, but that this obligation was not to be secured by mortgage or lien against the land. It was also alleged that at the time this agreement was made Frank Hicks paid Lisko, in advance of maturity and without deduction of interest, a certain portion of the indebtedness then outstanding; that this was done at Lisko's request, and that Lisko then advised Frank Hicks that the money was to be used in payment of a part of the purchase price at the commissioner's sale. A further allegation was that subsequent to the sale Frank Hicks paid the heirs of John Lisko a portion of the indebtedness secured by the land "in accordance with the agreement between Frank Hicks and John Lisko for the purchase of said lands at the commissioner's sale by John Lisko." This amendment to the original petition was filed June 10, 1935. There was a response, denying all material matters.

John Lisko, Sr., having died on March 14, 1934, Andrew Lisko, on June 10, 1935, asked "that the cause of action herein be revived in the name of Andrew Lisko, administrator with the will annexed of the estate of John Lisko." The motion was granted over the exceptions of Frank and Roy Hicks.

On final hearing the court found that Frank Hicks and John Lisko, Sr., entered into the oral contract substantially as alleged; that Roy Hicks had disclaimed interest and was discontinued as a party; that the defendants and respondents should recover from Frank Hicks $579.92 covering notes of Frank Hicks, with interest from maturity, such notes being payable January 6, 1938, and January 6, 1939, and not to be accelerated; that recovery should include the additional sum of $582.41, representing the Crandall indebtedness and interest; also $353.30, representing costs, abstract, attorney's fee, taxes, redemption, and interest—a total of $1,743.11. After deducting the sum of the two notes of $289.81 each, the remainder of $1,173.19 was made payable in installments of $289.81, to mature annually beginning January 6, 1940. The court also found the uncontradicted testimony to be that "the things and amounts payable to or

receivable by all the heirs out of the property of the estate of John Lisko, Sr., have been discharged, and the widow, Mrs. John Lisko, Sr., is entitled to the remainder of the estate.''

Three contentions are advanced by appellants as grounds for reversal: (1) That no competent testimony was introduced to establish the alleged parol agreement. (2) That no writing was signed by Lisko, and the oral contract, if established, was one involving the sale of lands, or an interest in or concerning lands, and, therefore, within the fourth section of the Statute of Frauds. (3) That the evidence on behalf of appellees is not clear and convincing.

(1, 2) It is first insisted that if Frank Hicks [hereafter referred to as appellee] is to prevail, the oral contract must be established, and if so established the result would be a promise by Lisko to lend appellee additional funds. Such a contract, it is urged, would create a chose in action, as distinguished from an interest in real property, and would go to the administrator.

It is insisted that certain testimony, without which the chancellor could not have found in favor of appellee, was incompetent under § 5154 of Pope's Digest. That section provides that ''In civil cases . . . in actions by or against executors, administrators or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transactions with or statements of the testator, intestate or ward, unless called to testify thereto by the opposite party.''

In *Lawrence* v. *LaCade*, 46 Ark. 378, it was held that the prohibition which now appears as § 5154 of Pope's Digest does not apply ''when widows and heirs are the parties.''

In *Heaslet* v. *Spratlin*, 54 Ark. 185, 15 S. W. 461, it was held that the testimony must be objected to when offered. The decisions in the LaCade and Heaslet cases have been consistently followed by this court.

The depositions of Kate Petrus, Mary Oslica, and Andrew Lisko, children of John Lisko, and the deposition

of Joseph Morrison, attorney for appellants, appear in the transcript as the first evidence offered in behalf of appellants. This testimony is replete with references to conversations and transactions between John Lisko and the Hicks brothers. If § 5154 of Pope's Digest were applicable, the privilege was waived when this testimony was introduced.

Although the cause was revived in the name of the administrator and the widow and heirs of John Lisko, the decree recites that the widow was, at the time such decree was rendered, the only interested party, others having been settled with. No indebtedness against the estate was shown or alleged. Appellee's petition (his brother then being a party) was filed in chancery suit No. 2979, this being the original action brought by E. W. Crandall. The court retained jurisdiction for the purpose of determining the equities of John Lisko on the latter's answer and cross-complaint. When the cause was revived the administrator, heirs and widow, were made parties over the objections of appellee. Appellee at that time was claiming to be the true owner of the property. The chancellor found, as a matter of fact, that Lisko's purchase was for the benefit of appellee, and that "the said Lisko held such property only as security for indebtedness. ..."

If this be the effect of the contract, Lisko became a trustee for appellee. Therefore, the transaction was one involving real estate, the title to which, *prima facie* and of record, was in Lisko. Nevertheless, if the contract be admitted, such title was subject to the terms of the trust. But an express trust comes within the terms of § 6064 of Pope's Digest, the provisions of which are: "All declarations or creations of trusts or confidences of any lands or tenements shall be manifested and proved by some writing signed by the party who is or shall be by law enabled to declare such trusts, or by his last will in writing, or else they shall be void; (a) and all grants and assignments of any trust or confidences shall be in writing, signed by the party granting or assigning the

same, or by his last will in writing, or else they shall be void."

The rule is that a parol agreement that another shall be interested in the purchase of lands, or a parol declaration by a purchaser that he buys for another, without an advance of money by that other, falls within the Statute of Frauds, and cannot give birth to a resulting trust. *Bland* v. *Talley*, 50 Ark. 71, 6 S. W. 234.

In *Grayson* v. *Bowlin*, 70 Ark. 145, 66 S. W. 658, a minor purchased and paid for lands; but the parties, assuming that such minor was incapable of taking the title by reason of his minority, a deed was made in his father's name. It was held that an express oral agreement of the father to hold as trustee for the son would not change the nature of the transaction from a resulting trust to an express trust. As to resulting trusts, or implied trusts; §. 6065 of Pope's Digest provides: "Where any conveyance shall be made of any lands or tenements, by which a trust or confidence may arise or result by implication of law, such trust or confidence shall not be affected by anything contained in this act." ["This act" being the Statute of Frauds.]

There was nothing in the relationship between appellee and Lisko or in the transactions between them that would create a resulting trust as to the purchase by Lisko at the commissioner's sale, unless some of the purchase money was supplied by appellee. If such be shown, a trust would result by implication of law for appellee's benefit to the extent of the money furnished. *Lasker-Morris Bank & Trust Co.* v. *Gans*, 132 Ark. 402, 200 S. W. 1029. [For quotations from Pomeroy's Equity Jurisprudence on resulting and constructive trusts, see *Edlin* v. *Moser*, 176 Ark. 1107 at pages 1116 and 1117, 5 S. W. 2d 923.]

Appellee testified that prior to the date of the commissioner's sale he had a conversation with Lisko at the latter's home. Appellee had a rice check for $640.51. He owed Lisko a note for $289.81, which matured January 6, 1935, and also owed two other items aggregating $185 —a total of $474.81. After paying these obligations (pre-

sumably with interest) appellee testified that a difference of $152.09 was due him. This statement appears in appellee's testimony: "I told him that I wanted the amount of that check that was left over, the $152.09, to pay some labor and some other bills I had, and Mr. Lisko said he would need that to himself use to purchase this property at the foreclosure sale. I said, 'that's all right; if you need it, why, just credit it on my next note.' So I was credited on my next note for that amount." This conversation is alleged to have occurred February 13, 1934. Appellee's note which he claims was credited with the differential was not due until January 6, 1935.

(3) The most difficult problem is to determine whether the parol agreement was established by clear and convincing evidence. It is insisted, and not without persuasive argument, that a "copy of a copy" of a letter alleged to have been written by Frank Hicks to Roy Hicks, upon which the purported indorsement of John Lisko appears under date of February 15—the day after the Hicks brothers claim to have interviewed him, and a day before the sale—was not admissible, and that the indorsement was not that of Lisko. It is urged that a finding to this effect would remove from the record the written agreement with Lisko upon which reliance was placed to take the transaction without the Statute of Frauds, and that such finding would discredit the testimony of Frank and Roy Hicks.

The Hicks brothers testified that they called on Lisko on February 15—two days before the sale. There is some uncertainty as to whether the visit was on the 14th or the 15th, but this is immaterial. Their purpose was to procure $850 from Lisko to be used by appellee in buying Roy's equity in the property. The fact of the visit is established by Lisko's two daughters. They stated that an effort was made to borrow money, either $800 or $850, and that their father refused to make the loan; whereupon Roy Hicks became angry and threatened to stop the sale. One of the daughters testified that she was in the room where her sick father and the Hicks brothers were talking. The other testified that she was in an adjoining

room, but heard the conversations through an open door. Each was quite positive that their father did not agree to buy the property for the benefit of appellee. Roy Hicks and appellee are just as positive that such an agreement was entered into. They urge as equitable considerations that improvements worth from $5,000 to $7,000 had been made by them on the lots, and that appellee continued to meet his annual payments on the notes given in pursuance of the contract of 1933. These notes, it will be recalled, aggregated $1,738.86, and were in satisfaction of an indebtedness of $1,473.59. The sum of $265.27, apparently, was added to the debt, yet each note drew interest at 6 per cent. from date.

At the time the decree was rendered in May, 1937, one of the items mentioned, for which appellants were given judgment and a lien, was $579.92, representing two of the notes executed by appellee in 1933 as a condition of the contract of January 6. [Note error of 30c.]

The amount for which this portion of the judgment was given would show that the first four notes of the series—those maturing in 1934, 1935, 1936, and 1937—had been paid.

The findings of the chancellor, as reflected by the decree, supply appellants with security worth more than twice the amount of the judgment. Every item of expense—lawyers' fees, abstract, insurance, taxes, special assessments, interest, etc.—is covered by the judgment.

In the response filed April 20, 1934, appellants alleged the insolvency of Frank and Roy Hicks—"they are not collectible by judgment at law." Yet, in spite of appellee's financial status, he continued to meet the obligations imposed under the 1933 contract, and between 1934 and 1937 paid his notes, and this at a time when the legal title to the property in question was in the Liskos.

Except where the law explicitly says "thou shalt," or "thou shalt not," there are few cases where a strict construction of evidence and attending circumstances, as distinguished from a so-called liberal interpretation, would not tilt the scales away from the median line where Justice stands poised in the zone of judicial neutrality.

So, in the appeal before us, a slight impulse of opinion in either direction might result in an affirmance or a reversal of the decree. But in the final analysis we cannot lose sight of the fact that under the chancellor's findings and in consequence of the judgment, appellants will be recompensed with ample—even liberal—interest for all the money their predecessor invested. Appellee, if able in the future to meet the terms imposed, is given an opportunity to salvage his earnings and save his property.

In these circumstances, and in view of all the testimony, we are not willing to say that the chancellor was in error.

The decree is, therefore, affirmed.